# IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| FAROUK SYSTEMS, INC. | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 4:10-mc-300 |
| | § | |
| EYOU INTERNATIONAL TRADING | § | |
| COMPANY, LTD., FUZHOU HENQJU | § | |
| TRADE CO. LTD., EBRANDSALE | § | **FILED UNDER SEAL** |
| TRADE CO. LTD., EBAGI TRADING CO. | § | **PURSUANT TO 15 U.S.C. § 1116** |
| LTD., HANGZHOU DREAM CLOUDS | § | |
| GARMENT STORE;  et al. | § | |
| | § | |
| Defendants. | § | |

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER, SEIZURE ORDER, DOMAIN NAME TRANSFER ORDER, ASSET RESTRAINING ORDER, EXPEDITED DISCOVERY ORDER AND ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

---

Anthony Matheny
Attorney-In-Charge
Texas State Bar No. 24002543
S.D. Texas Admission No. 303157
Greenberg Traurig, LLP
1000 Louisiana, Suite 1700
Houston, Texas   77002
(713) 374-3583 (Telephone)
(713) 754-7583 (Fax)

Of Counsel:

Ben D. Tobor
Texas State Bar No. 20050900
S.D. Texas Admission No. 5254
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  713-374-3568
Facsimile:  713-754-7568

Scott Gelin
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, NY  10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
*Pro hac vice pending*

*Attorneys for Farouk Systems, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................... iii

I. PRELIMINARY STATEMENT ................................................................................. 1

II. FACTUAL BACKGROUND ..................................................................................... 6

    A.    Farouk's CHI Trademarks and Products ......................................................... 6

    B.    Defendants' Counterfeiting Operations ........................................................... 7

        1.    Defendants' Sales of Counterfeit CHI Products on B2B Sites ........................ 8

        2.    Defendants' Use of Multiple False Identities to Avoid Detection. .................. 10

        3.    Defendants' Sale of Counterfeit CHI Products on Separate Web Sites. .......... 13

III. ARGUMENT AND AUTHORITIES ....................................................................... 15

    A.    This Court Has Personal Jurisdiction Over Defendants ............................... 15

    B.    Farouk Is Entitled To a Temporary Restraining Order and Preliminary
        Injunction Enjoining Defendants' Illegal Acts ........................................... 20

        1.    Farouk Is Likely to Prevail on Its Claims ..................................................... 21

            a.    Farouk Is Likely to Prevail on Its Trademark Counterfeiting ................ 21

            b.    Plaintiff Will Likely Prevail on Its Anticybersquatting Consumer
                Protection Act Claims ........................................................................... 23

                i.    Plaintiff's Marks Are Distinctive and Famous .............................. 24

                ii.    The Infringing Domain Names Are Identical Or
                    Confusingly Similar to Or Dilutive of the Plaintiff's Marks ......... 25

                iii.    Defendants Have Bad Faith Intent to Profit from Plaintiff's
                    CHI Marks ..................................................................................... 25

        2.    Defendants' Sale of Counterfeit CHI Products Irreparably Harms
            Plaintiff's Marks, Goodwill and Business ................................................. 25

        3.    There is a Fair Ground for Litigation and the Balance of Hardships Tips
            Decidedly in Plaintiff's Favor ................................................................. 26

        4.    An Injunction Against Defendants Is in the Public Interest ........................ 27

C.    This Court Has the Authority to Issue an *Ex Parte* Order ........................................ 28

D.    Farouk is Entitled to an Order Preventing  The Fraudulent Transfer of Defendants' Assets ................................................................................... 32

E.    Farouk is Entitled to Expedited Discovery ............................................. 34

F.    Service of Process By Email is Warranted in this Case ............................................ 36

IV. CONCLUSION .......................................................................................... 39

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adv. Portfolio Techs., Inc. v. Adv. Portfolio Techs. Ltd.*,
   No. 94 Civ. 5620, 1994 WL 719696 (S.D.N.Y. Dec. 28, 1994)............................................. 37

*Action Tapes, Inc. v. Victoria Weaver*,
   No. 3:05-CV-1693-H,
   2005 U.S. Dist LEXIS 8675 (N.D. Tex. Oct. 24, 2005)......................................................... 20

*Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*,
   04 Civ. 6107 (DAB), 2006 U.S. Dist. LEXIS 56703 (S.D.N.Y. Aug. 8, 2006) ...................... 26

*Am. Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n*,
   532 F. Supp. 1376 (S.D. Tex. 1982)............................................................................... 29, 30

*Animale Group, Inc. v. Sunny's Perfume, Inc.*,
   No. 07-40200, 2007 U.S. App. LEXIS 28183 (5th Cir. Dec. 7, 2007).................................... 34

*Ballistic Prods., Inc. v. Precision Reloading, Inc.*,
   No. 03-2950 AMD/AJB, 2003 U.S. Dist. LEXIS 13148 (D. Minn. July 28, 2003)................. 34

*Bean Dredging Corp. v. Dredge Tech. Corp.*,
   744 F.2d 1081 (5th Cir. 1984) ............................................................................................ 21

*Blue Bell Bio-Med. v. Cin-Bad, Inc.*,
   864 F.2d 1253 (5th Cir. 1989) ............................................................................................ 23

*Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.*,
   510 F.2d 1004 (5th Cir.), cert. denied, 423 U.S. 868 (1975)................................................ 22

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)..................................................... 19, 21

*Century 21 Real Estate Corp. v. Sandlin*,
   846 F.2d 1175 (9th Cir. 1988) ............................................................................................ 24

*Chanel, Inc. v. Lin et al.*,
   No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61296
   (N.D.C.A. May 7, 2010) ..................................................................................................... 20

*Chemlawn Serv. Corp. v. GNC Pumps, Inc.*,
   690 F. Supp. 1560 (S.D. Tex. 1988)..................................................................................... 28

*Corning Glass Works v. Jeanette Glass Co.*,
   308 F. Supp. 1321 (S.D.N.Y. 1970), aff'd, 432 F.2d 784 (2d Cir. 1970)................................ 29

*Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.*,
   604 F.2d 200 (2d Cir. 1979) ............................................................................................... 22

*Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.,*
No. 01 Civ. 2950 (DAB)(DCF), 2005 U.S. Dist. LEXIS 19496
(S.D.N.Y. Sept. 6, 2005) ......................................................................................... 26

*E & J Gallo Winery v. Spider Webs Ltd. et al.,*
286 F. 3d 270 (5th Cir. 2002) ................................................................................ 26

*Farouk Sys., Inc. v. Parmar,*
No. H-07-3384,
2008 U.S. Dist. LEXIS 62920, at *3-4 (S.D. Tex. Aug. 14 2008) ........................... 9, 23, 25, 27

*Fed. Savs. & Loan Ins. Corp. v. Dixon,*
835 F.2d 554 (5th Cir. 1987) ................................................................................. 34

*Finck Cigar Co. v. El Duque Group, Inc.,*
No. SA-99-CA-0817-EP,
2000 U.S. Dist. LEXIS 22728, at *1 (WD Tex. May 12, 2000) ................................ 21

*Firma Melodiya v. ZYX Music GmbH,*
882 F. Supp. 1306, 1312 (S.D.N.Y. 1995) ............................................................. 25

*Ford Motor Co. v. Lapertosa,*
126 F. Supp. 2d 463, 62 U.S.P.Q.2d 1789 (E.D. Mich., 2000) ............................... 34

*Freedom Calls Found. v. Bukstel*, No. 05 CV 5460 (SJ)(VVP),
2006 U.S. Dist. LEXIS 19685 (E.D.N.Y. Mar. 3, 2006) .......................................... 27

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.,*
286 F. Supp. 2d 284 (S.D.N.Y. 2003) ................................................................... 24

*Guy Carpenter & Co. v. Provanzale,*
334 F.3d 459 (5th Cir. 2003) ................................................................................. 23

*Hawkins Pro-Cuts, Inc. v. DJT Hair, Inc.,*
1997 WL 446458 (N.D. Tex. July 25, 1997) .......................................................... 28

*Helicopteros Nacionales de Colombia, S.A. v. Hall,*
466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) ......................................... 18

*HER, Inc. v. Re/Max First Choice, LLC,*
No. 2:06-CV-492, U.S. Dist. LEXIS 94629 (S.D. Ohio Dec. 12, 2007) ................... 34

*In re Vuitton et Fils S.A.,*
606 F.2d 1 (2d Cir. 1979) ...................................................................................... 24

*Int'l Shoe Co. v. Wash.,*
326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) ................................................... 18

*Keller William Realty, Inc. v. Charles Lapeer*, et al.,
No. 4:08-CV-1292, 2008 U.S. Dist. LEXIS 58079 (S.D. Tex. Oct. 20, 2008) ......... 39, 40

*Lesportsac, Inc. v. KMart Corp.,*
754 F.2d 71 (2d Cir. 1985) .................................................................................... 29

*Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,*
51 F.3d 982 (11th Cir. 1995) ................................................................................. 24, 35, 36

*Louis Vuitton Malletier & Oakley, Inc. v. Veit*,
211 F. Supp. 2d 567 (D. Pa. 2002) ........................................................ 27

*Lucas Nursery v. Grosse*,
359 F.3d 806 (6th Cir. 2004) .................................................................. 26

*Luv n' Care, Ltd. v. Insta-Mix, Inc.*,
438 F.3d 465 (5th Cir. 2006) .................................................................. 21

*Mattel, Inc. v. Internet Dimensions, Inc.*,
55 U.S.P.Q.2d 1620 (S.D.N.Y. 2000) ..................................................... 27

*MGM Well Servs., Inc. v. Mega Lift Sys., LLC*,
No. H-05-1634, U.S. Dist. LEXIS 34024 (S.D. Tex. July 19, 2005) ....................................... 29

*Microsoft Corp. v. Software Wholesale Club, Inc.*,
129 F. Supp. 2d 995 (S.D. Tex. 2000) ..................................................... 24

*Mid City Bowling Lanes & Sports Palace, Inc. v. Ivercrest, Inc.*,
35 F. Supp. 2d 507 (E.D. La. 1999), aff'd, 208 F.3d 1006 (5th Cir. 2000) ............................. 18

*Mink v. AAAA Dev. LLC*,
190 F.3d 333 (5th Cir.1999) .............................................................. 18, 19

*Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ............................................................................. 39

*Nuovo Pignone v. Sorman Asia M/V*,
310 F.3d 374 (5th Cir. 2002) .................................................................. 19

*Oliva v. Ramirez*,
No. 07-1569 (JAG), 2007 U.S. Dist. LEXIS 62011 (D.P.R. Aug. 21, 2007) ............................. 34

*Paco Rabanne Parfums S.A. v. Norco Enters.*,
680 F.2d 891 (2d Cir. 1982) ................................................................... 28

*Pebble Beach Co. v. Tour 18, Ltd.*,
155 F.3d 526 (5th Cir. 1998) .................................................................. 23

*PGA v Bankers Life & Cas. Co.*,
514 F.2d 665 (5th Cir. 1975) .................................................................. 22

*Phillip Morris USA, Inc. v. Lee*,
494 F. Supp. 2d 544 (E.D. Tex. 2007) ...................................................... 22

*Prime Publishers, Inc .v. Am.-Republican, Inc.*,
160 F. Supp. 2d 266 (D. Conn. 2001) ...................................................... 27

*Pro Hardware v Home Ctrs. of Am., Inc.*,
607 F. Supp. 146 (N.D. Tex. 1984) ...................................................... 28, 29

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.*,
737 F. Supp. 1521 (S.D.C.A. 1990) ...................................................... 35, 36

*Republic of Philippines v. Marcos*,
862 F.2d 1355 (9th Cir. 1988), cert. denied, 490 U.S. 1035 (1989) ......................................... 36

*Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.*,
    836 F. Supp. 1247 (W.D. Va. 1993) ............................................................ 30, 31

*Ruston Gas Turbines v. Donaldson Co.*,
    9 F.3d 415 (5th Cir. 1993) ......................................................................... 21, 22

*Sinko v. St. Louis Music Supply Co.*,
    603 F. Supp. 649 (W.D. Tex. 1984) ................................................................ 21

*Sno-Wizard Mfg., Inc. v. Eisemann Prod. Co.*,
    791 F.2d 423 (5th Cir. 1986) ........................................................................... 25

*Southern Monorail Co. v. Robbins & Myers, Inc.*,
    666 F.2d 185 (5th Cir. 1982) ........................................................................... 23

*SunAmerica Corp. v. Sun Life Assurance Co. of Canada*,
    77 F.3d 1325 (11th Cir. 1996) ......................................................................... 30

*Trans Union LLC v. Credit Research, Inc*,
    142 F. Supp. 2d 1029 (N.D. Ill. 2001) ............................................................ 34

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.*,
    576 F.3d 221, 226-27 (5th Cir. 2009) .............................................................. 25

*Waples-Platter Cos. v. Gen. Foods Corp.*,
    439 F. Supp. 551 (N.D. Tex. 1977) ............................................................ 22, 28

*Wien Air Alaska, Inc. v. Brandt,,*
    195 F.3d 208 (5th Cir. 1999) ...................................................................... 21, 22

*World Wide Volkswagen Corp. v. Woodson*
    444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) ...................................... 21

*Zippo Mfg. Co. v. Zippo DOT Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997) .......................................................... 19, 20

## Federal Statutes

15 U.S.C. § 1057(b) ............................................................................................. 23

15 U.S.C. § 1116(d)(4)(B) ................................................................................... 32

15 U.S.C. § 1117 .................................................................................................. 35

15 U.S.C. § 1125(d) ............................................................................................. 26

15 U.S.C. § 1125(d)(1)(A) ................................................................................... 26

Fed. R. Civ. P. 30(b), 34(b) ................................................................................. 37

Fed. R. Civ. P. 4(f)(3) .......................................................................................... 39

## Other Authorities

4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1061 (2d ed. 1987) ...................... 39

Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984) .......................................................................... 31

Farouk Systems, Inc. submits this Memorandum of Law in support of its *ex parte* Application for a Temporary Restraining Order, Seizure Order, Domain Name Transfer Order, Asset Restraining Order, Expedited Discovery Order, and Order to Show Cause for Preliminary Injunction as against EYOU INTERNATIONAL TRADING COMPANY, LTD., FUZHOU HENQJU TRADE CO., LTD.; EBRABDSALE TRADE CO. LTD., EBAGI TRADING CO. LTD.; HANGZHOU DREAM CLOUDS GARMENT STORE; et al. (collectively, "Defendants") based on an action for trademark counterfeiting and cybersquatting arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 et seq., as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984), the Anti-Cybersquatting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996), and the Prioritizing Resources and Organization for Intellectual Property Act of 2007, H.R. 4279 (October 13, 2008) (the "Lanham Act") and, in support respectfully shows:

## I.
## PRELIMINARY STATEMENT

Trademark counterfeiting is an illegal, multi-billion dollar business that harms both consumers, who are deceived into believing they are buying genuine branded goods when they are actually buying counterfeits (often with severe safety implications), and brand owners, who are deprived of sales and subject to a loss of goodwill from these low-quality counterfeits bearing their marks. The Internet has made it easy for counterfeiters to hide their true identities and operate under multiple false names and addresses in an attempt to avoid civil and criminal liability.

Farouk Systems, Inc. ("Farouk" or "Plaintiff"), which is headquartered in and manufactures its products primarily in this Judicial District, produces the extremely popular CHI line of hair styling irons and other beauty products such as those pictured below:

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 1**



Farouk has become the victim of a massive Internet counterfeiting ring of a size and scale it has not seen before. Defendants, acting in concert with one another, are utilizing a variety of false identities and are operating through a variety of web sites to sell counterfeit CHI products to consumers in the United States, including in this Judicial District.

Defendants are selling large quantities of counterfeit CHI products at wholesale on popular China-based online "business-to-business" ("B2B") selling platforms, such as and DIYtrade.com, Alibaba.com and Tradekey.com. These B2B sites allow Defendants to create their own professional-looking web pages, written in English and bearing various seals of approval supplied by the B2B Sites: Gold Supplier , Verified Supplier , Biz Member , TRADE PRO and GoldKey Member . These counterfeit CHI products are marketed to and intended for U.S. consumers and designed to appear to be identical to genuine CHI products. These counterfeit CHI products are sold by Defendants either as genuine CHI irons or 'same as genuine' CHI irons at wholesale and then resold to consumers at retail through web sites such as eBay.com and Amazon.com and elsewhere.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 2**

In addition to the B2B sites, Defendants are simultaneously operating dozens of fully-interactive Internet web sites, often linked to their B2B web pages, where they sell counterfeit CHI products directly to U.S. consumers. As shown in the examples below, Defendants design their web sites to appear to be authorized online retailers selling genuine CHI hair styling irons. Defendants perpetuate this illusion by using domain names incorporating Farouk's registered CHI trademarks (*e.g.*, chi-hair.com, chihaironline.com, and chiflatirons.com). In addition, Defendants copy portions of Farouk's original photos, detailed product descriptions and warranty information directly from Farouk's own web site. In order to avoid detection, Defendants use different fake names and addresses in connection with these web sites from the ones they use on their B2B web pages.





Farouk's investigators have purchased and received 46 CHI hair styling irons and hair dryers, at least one from each of the named Defendants. <u>Each and every one is counterfeit</u>. Farouk's investigators have learned that these counterfeit CHI products are coming from a smaller group of interconnected counterfeiters, doing business under multiple, interchangeable, false names and addresses in order to avoid detection.

When orders are placed, Defendants ship the counterfeit goods, generally from China, to the U.S. via express mail in ways designed to minimize the chances of attracting the attention of U.S. Customs and Border Protection ("CBP"). For example, Defendants routinely mismark information required on the CBP-required declaration form about the contents of the packages, declaring that the fake CHI products are "t-shirts," "samples" or "flash lights." To avoid detection, Defendants uniformly use fake and incomplete return addresses, but different fake names and addresses from those Defendants use in connection with the B2B web pages and web sites.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 4**

Even when a brand owner such as Farouk challenges Defendants' sales of counterfeit goods by requesting that B2B sites or ISPs remove the infringing sales, Defendants merely switch to another phony identity and proceed with business as usual. Indeed, before initiating this action, Farouk sent more than 50 notices to the B2B site Alibaba.com putting it on notice that nine different Defendants named in this action were selling counterfeit CHI products. To date, all nine Defendants continue to sell counterfeit CHI products on Alibaba.com.[1] To borrow from the well-worn analogy of comparing an anti-counterfeiting program to playing a game of "whack-a-mole," combating this modern day Internet-driven counterfeiting ring is akin to playing a game of whack-a-mole-on-steroids.

Defendants' purposeful, intentional, and unlawful conduct is causing, and will continue to cause, irreparable harm to Farouk's reputation and the goodwill symbolized by its trademarks. To freeze Defendants' activities -- or at least effectively chill them -- Farouk respectfully requests that this Court issue *ex parte*: (i) a Temporary Restraining Order and Preliminary Injunction against Defendants enjoining the importation, distribution, offer for sale, and sale of the counterfeit CHI products; (ii) an Order temporarily transferring Defendants' domain names containing the CHI trademarks to Farouk, (iii) an Order temporarily restricting transfer of Defendants' assets to preserve Farouk's right to an equitable accounting; (iv) an Order for Expedited Discovery allowing Farouk to access, inspect, and copy Defendants' records relating to the distribution, offer of sale, and sale of the counterfeit CHI products and Defendants' financial accounts; and (v) an Order allowing service by electronic mail. Farouk does not request this relief lightly. If not granted,

---

[1] Declaration of Scott Gelin, dated July 23, 2010 ("Gelin Decl.") ¶ 4, filed contemporaneously herewith.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 5**

Defendants' counterfeiting activities will continue unabated, causing irreparable harm to Farouk and its trademarks.

## II.
## FACTUAL BACKGROUND

**A.      Farouk's CHI Trademarks and Products**

Farouk was founded in 1986 by now well-known stylist and entrepreneur Farouk Shami.[2] For the past 24 years, Farouk, along with its predecessors in interest and associated companies, have sold high-quality hair styling products, including since 2002 under its extremely successful CHI line of hair styling irons, hair dryers and other beauty products (collectively, the "CHI Products").[3] Farouk's CHI trademarks as listed in the Complaint (collectively, the "CHI Marks") are the subject of numerous valid and subsisting U.S. registrations, many of which have become incontestable.[4] In addition, Farouk owns trademark registrations in China for CHI for hair styling irons and other products,[5] among other countries throughout the world.  For its entire existence, Farouk has been located in Houston, TX.  Farouk currently employs more than 1,000 workers, mostly at its Houston headquarters.[6]  In  2009, Farouk moved much of its manufacturing, including manufacturing of certain of its CHI hair irons, from China to Houston, creating hundreds of local manufacturing jobs.[7]

The CHI Marks have been widely promoted in the U.S.[8]  Every year, Farouk spends hundreds of thousands of dollars advertising and promoting the CHI Products, which are sold in

---

[2] Declaration of Wisam Ghuneim, dated July 20, 2010 ("Ghuneim Decl.") ¶¶ 4-7, filed contemporaneously herewith.
[3] *Id.* ¶ 6.
[4] *Id.*
[5] Ghuneim Decl. ¶ 7.
[6] *Id.* ¶ 8.
[7] *Id.*
[8] *Id.* ¶ 11.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 6**

connection with the CHI Marks.[9] The CHI Marks are featured prominently in the advertising and promotion of Farouk's CHI Products.[10] Genuine CHI Products are distributed through a network of authorized distributors and retailers.[11] Farouk maintains high safety and quality control standards for CHI Products and is deeply committed to customer service.[12]

By any measure, the CHI Marks have become symbols of excellence in hair care products and are uniquely associated with Farouk. In a separate counterfeiting action from 2008 in which Farouk (in that case referred to as "FSI") was the plaintiff, this Court found:

> The trademark CHI® is associated exclusively with FSI for use with hair irons as well as numerous other hair care products. FSI has used the mark CHI® in interstate commerce continuously since 2002. As a result of FSI's marketing of its products and the extensive advertising and other business generation efforts to promote the mark, it has become well known in the Houston metropolitan area, the State of Texas, the United States, and internationally as identifying FSI's products and business. Customers and potential customers in these areas have come to identify the mark as originating with FSI. FSI has developed substantial recognition among the consuming public for its high quality products sold under its CHI® mark and has acquired and enjoys a valuable reputation and significant goodwill associated with its CHI® mark and products sold under its CHI® mark. FSI's use of the mark in the hair-care industry has been exclusive. As a result of this exclusive use of the mark and the long and widespread use that had been made by FSI of the mark, there is substantial recognition and association of the mark with FSI by the consuming public for hair-care products.[13]

## B.  Defendants' Counterfeiting Operations

Farouk has become a victim of a massive online counterfeiting scheme of a size and scope it has not seen before.[14] With no authorization from Farouk, Defendants -- acting in concert with one another -- are importing, distributing, offering to sell and selling counterfeit versions of CHI Products ("Counterfeit CHI Products") to consumers in the U.S., using an online scheme involving

---

[9] Ghuneim Decl. ¶ 11.
[10] *Id.* ¶¶ 4,5.
[11] *Id.* ¶ 8.
[12] *Id.* ¶ 5.
[13] *Farouk Sys., Inc. v. Parmar*, No. H-07-3384, 2008 U.S. Dist. LEXIS 62920, at *3-4 (S.D. Tex. Aug. 14 2008).
[14] Ghuneim Decl. ¶ 16.

dozens of B2B web pages and stand-alone web sites. To avoid detection, Defendants are using multiple fake names and addresses for each of the different facets of their business.[15] Through its investigation, Farouk has learned that a smaller, interrelated group of Defendants is operating behind these false identities.[16]

1.  Defendants' Sales of Counterfeit CHI Products on B2B Sites

Defendants are selling Counterfeit CHI Products at wholesale on popular China-based online B2B selling platforms such as DIYTrade.com, Alibaba.com., and Tradekey.com (the "B2B Sites").[17] The B2B Sites are online marketplaces that connect third-party sellers of wholesale goods, primarily in China, with prospective buyers, primarily in the U.S., who resell these products to U.S. consumers at retail. The B2B Sites are written in English, and certain of these web sites are hosted on servers in the U.S. to provide faster connections for U.S.-based buyers.[18]

Sellers, like Defendants, who become members of one or more of the B2B Sites can configure their own web pages, where they can display and offer products for sale and provide information like contact information, prices, and minimum order amounts, as well as payment and shipping information.[19] Prospective buyers can find sellers through the B2B Sites' search engines and then contact sellers via sellers' web pages. [20] Each B2B Site offers one or more "trust seals" that its member sellers can acquire for a fee, and display as icons on their web pages such as:

 Gold Supplier ,  Verified Supplier ,  Biz Member ,  TRADE **PRO** and  GoldKey Member .[21]

---

[15] Declaration of Matthew Hewlett, dated July 21, 2010 ("Hewlett Decl.") ¶ 29, Ex. B, filed contemporaneously herewith.
[16] *Id.* ¶ 17.
[17] The B2B Sites EC21.com is based in Korea rather than China. Hewlett Decl. ¶ 8.
[18] Hewlett Decl. ¶ 6.
[19] *Id.* ¶ 7.
[20] *Id.*
[21] *Id.* ¶ 8.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 8**

The purpose of these trust seals is to verify for buyers that a particular seller is reputable and that it is selling genuine goods.[22] In the case of Defendants, nothing could be further from the truth.

Defendants are posing as dozens of separate manufacturers and selling agents on the B2B Sites, selling large quantities of what they claim are genuine or "same as genuine" CHI Products at wholesale for low prices.[23] At any given time a search for "chi irons" or a similar search term on the various B2B Sites reveals approximately 1,000 different sales offers for CHI Products from what appears to be 60-70 different China or Hong Kong-based sellers.[24] But as discussed below, the number of different sellers is much smaller, as Defendants are using multiple false identities.[25] A few sellers on these B2B Sites claim to be selling from the U.S. or Canada but Farouk's investigation has shown they are actually located in China.[26]

All of the CHI Products being offered by Defendants on these B2B Sites are counterfeit.[27] In the course of this investigation, Farouk's investigators have purchased and received 46 CHI Products, at least one CHI Product from each named Defendant and every one has been identified as a Counterfeit CHI Product.[28] Each Counterfeit CHI Product was designed to exactly replicate a genuine CHI product intended for the U.S. market.[29]

It is not surprising that each investigative purchase from Defendants has turned out to be fake, as the CHI Products that Defendants are selling can be identified as counterfeit in many other ways, including the following factors: (1) none of the Defendants are authorized to manufacture or

---

[22] Hewlett Decl. ¶ 8.
[23] *Id.* ¶ 11.
[24] *Id.* ¶ 10.
[25] *Id.* ¶ 18.
[26] *Id.* ¶ 19.
[27] Hewlett Decl. ¶ 15; Ghuneim Decl. ¶ 17.
[28] Hewlett Decl. ¶ 15.
[29] *Id.* ¶ 11.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 9**

sell genuine CHI Products and in fact there are no authorized distributors and sellers of genuine CHI Products in China, (2) certain of the models of CHI Products offered by Defendants in China are only manufactured in the U.S. including the Farouk's "Made in the USA" line of CHI Products, (3) the wholesale prices of the CHI Products and quantities of CHI Products being offered indicate they are counterfeit and (4) many of the CHI Products can be identified as fake based on Defendants' pictures of the goods on their web pages.[30] The Counterfeit CHI Products purchased over the course of this investigation bear similar irregularities and indicia of being counterfeit to one another, indicating that the Counterfeit CHI Products were manufactured by and come from a common source and that Defendants are interrelated.[31]

These Counterfeit CHI Products sold by Defendants in wholesale quantities to buyers in the U.S. are then resold at retail to unknowing consumers as genuine CHI Products on sites like eBay.com, Amazon.com, and in other online and brick-and-mortar retail venues.[32] Indeed, when Farouk catches sellers of Counterfeit CHI Products on selling platforms such as eBay.com and Amazon.com, it typically learns that these sellers purchased the goods from suppliers on the B2B Sites, including from the Defendants.[33]

2. Defendants' Use of Multiple False Identities to Avoid Detection.

Farouk's investigation has revealed that Defendants are selling Counterfeit CHI Products under a series of false identities on the Internet to avoid detection.[34] To provide one example, investigations have shown that information provided by Defendant EYOU International Trading Co., Ltd. ("EYOU") is entirely false. EYOU claims on its Tradekey.com web page as well as its

---

[30] Ghuneim Decl. ¶ 17.
[31] Hewlett Decl. ¶ 17.
[32] Gelin Decl. ¶ 5.
[33] *Id.* ¶¶ 5-6.
[34] Hewlett Decl. ¶ 18.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 10**

stand-alone web site www.eyoutrade.com that it is located at "No. 599 JingJin Road, Fengze Area, Quanzhou City, Fujian, China," that it has been in business since 2001 and that it has more than 100 employees.[35] EYOU's web page on Tradekey.com bears the "trust seal"  , and shows that EYOU has been a "GoldKey Member" since 2008, and that it has accumulated "4,100 TrustProfile points."[36] Farouk's investigation, however, has revealed that no company is or was registered in China to do business under the name EYOU International Trading Co. Ltd. and that EYOU's listed address "No. 599 JingJin Road, Fengze Area, Quanzhou City, Fujian, China," is nonexistent.[37] When Farouk's investigators purchased a "brand new in the box CHI digital flat iron" from EYOU, a Counterfeit CHI Product arrived in a package from an entirely different company, Zone Home Trading Co. Ltd., at an entirely different address.[38] EYOU's standalone web site www.eyoutrade.com was registered by yet another entity, Cinda Trading Co., Ltd, located at an entirely different address from the other two listed above.[39]

The practice of using of multiple fake names and addresses is consistent for all Defendants.[40] Defendants uniformly use separate false identities in connection with their shipments of Counterfeit CHI Products to the U.S. to avoid detection and liability for counterfeiting by U.S. Customs and Border Protection ("CBP") and/or by brand owners. All but two of the purchases made by Farouk's investigators in this action were shipped from China via China Courier Service Corporation's Express Mail Service ("EMS").[41] CBP requires that all packages entering the U.S. be accompanied by Declaration Form CN22 (the "CBP Declaration"), which must be completed in

---

[35] Gelin Decl. ¶ 7.
[36] Id.
[37] Id.
[38] Gelin Decl. ¶ 7; Hewlett Decl., Ex. B.
[39] Id.
[40] Hewlett Decl. ¶¶ 19, 20, 30.
[41] Id. ¶¶ 20, 21.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 11**

English.[42] The CBP Declaration, which is incorporated into the EMS waybill, requires the sender to provide (in English) its name and address and the contents of the package and to sign a declaration that this information is correct and that the package does not contain "dangerous or prohibited goods."[43] In every purchase in Farouk's investigation, Defendants' CBP Declaration/waybill was incomplete in the following ways: 1) the CBP Declaration/waybill did not contain a discernable or accurate return name and address of the sender, 2) the CBP Declaration/waybill did not identify the true contents of the package, instead claiming the package contained something else such as "t-shirt," "shoes," "flashlight," "gift," "sample" or "dress," and (3) the CBP Declaration/waybill was not signed declaring the information is correct and that the package did not contain "dangerous or prohibited goods."[44]

In addition, the Defendants' names and return addresses listed on the CBP Declarations/waybills of each of the 46 Counterfeit CHI Products received to date in this investigation were uniformly different from Defendants' names and addresses listed on their web pages. For example, the purchase of Counterfeit CHI Product from the Defendant listed as Yiwu Xinwang Hardware Commercial Firm on its web page arrived in a package (bearing the tracking number supplied by this Defendant) with the sender identified as WeiXiang Industry Development Company but no return address.[45] In fact, eight of the purchases made from supposedly unrelated Defendants listed WeiXiang Industry Development Company as the sender without any return address, demonstrating that these Counterfeit CHI Products came from a common source.[46] Farouk's China-based investigators were not able to find any information that would indicate that

---

[42] Hewlett Decl. ¶ 21.
[43] *Id.*
[44] *Id.*
[45] *Id.* ¶ 23.
[46] *Id.*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 12**

WeiXiang Industry Development Company is an actual company.[47] Approximately one-third of the Counterfeit CHI Products received bore a return address simply stating "Shanghai, China," with no other discernable information, further demonstrating a common source.[48]

To further obscure their operations and identities, Defendants use PayPal accounts under names that are completely unrelated to Defendants' other business names.[49] In the course of the investigative purchases made for this action, it was typical for a Defendant to request that the investigator conceal from PayPal that the payment was being made for a CHI Product."[50] It is apparent that Defendants are opening PayPal merchant payment accounts for ostensibly legitimate purposes but then using them to sell counterfeit goods, including Counterfeit CHI Products.[51] In short, Defendants' *modus operandi* is to use multiple false identities in every facet of their businesses in order to avoid detection for what they know are illegal activities.[52]

### 3. Defendants' Sale of Counterfeit CHI Products on Separate Web Sites.

In the course of its investigation, Farouk has learned that, in addition to selling Counterfeit CHI irons at wholesale on B2B web pages, Defendants have set up a number of different stand-alone web sites to sell counterfeit CHI Products directly to consumers at retail ("Defendants' Web Sites").[53] Defendants' Web Sites are designed to appear to unknowing consumers to be legitimate web stores authorized to sell genuine CHI Products.[54] They are sophisticated-looking, written in English and accept U.S. dollars and payment by PayPal.[55] These sites copy certain of Farouk's

---

[47] Hewlett Decl. ¶ 24.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.* ¶ 29, Ex. B.
[53] *Id.* ¶ 25.
[54] *Id.* ¶ 26.
[55] *Id.*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 13**

original photos of the CHI Products, detailed product descriptions, and warranty information directly from Farouk's own web site, suggesting that they are established businesses operated by or in conjunction with Farouk.[56]

To further convey to consumers that the counterfeit CHI Products are genuine, many of Defendants' Web Sites also utilize the CHI Marks in their domain names. The following is a list of 19 domain names associated with Defendants' Web Sites or controlled by Defendants which contain the CHI Marks (the "Infringing Domain Names"): chibuyus.com, chifactoryoutlet-us.com, chiflatirona.com, chiflatironb.com, chiflatironc.com, chiflatironm.com, chiflatironn.com, chiflatironok.com, chiflatirons.com, chiflatironsa.com, chiflatironsv.com, chiflatironv.com, chiflatirony.com, chihaironline.com, chiirontop.com, chi-hair.com, ghdchis.com, ghdchisales.com, mk4chi.com.[57]

Defendants, knowing what they are doing is illegal, are using demonstrably false names and incomplete identification in connection with Defendants' Web Sites in order to avoid detection, just as they are doing in all other facets of their operations.[58] The Internet Corporation for Assigned Names and Numbers (ICANN), the body that governs domain names, requires all who register domain names to provide accurate registration information, which is compiled in a network of publicly-available databases commonly referred to as "WhoIs."[59] In most of Defendants' domain name registrations, as visible in WhoIs, Defendants' listed names and addresses are incomplete, nonsense, randomly-typed letters, or street addresses with no cities or states listed.[60]

---

[56] Hewlett Decl. ¶ 26.
[57] *Id.* ¶ 27.
[58] *Id.* ¶ 28.
[59] *Id.*
[60] *Id.* ¶ 28, Ex. D.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 14**

Defendants' Counterfeit CHI Products are not genuine, and Defendants are in no way authorized to sell the Counterfeit Products.[61] Farouk did not manufacture, inspect, package, or approve the Counterfeit Products prior to sale or distribution by the Defendants.[62] The Counterfeit CHI Products are so similar in appearance to genuine CHI Products that it is likely consumers will be deceived into believing Defendants' Counterfeit CHI Products are authentic CHI Products.[63] While the Counterfeit CHI Products have been designed to be exact copies of genuine CHI products and are being sold as such, they are not of the same quality as genuine CHI Products.[64]

Defendants' sale of Counterfeit CHI Products is incredibly damaging to Farouk's reputation and goodwill, and without the relief requested by Plaintiff's instant motion, Defendants' illegal activities will continue unabated and Farouk will continue to suffer enormous irreparable harm.[65]

## III.
## ARGUMENT AND AUTHORITIES

### A.    This Court Has Personal Jurisdiction Over Defendants

Defendants are all subject to personal jurisdiction in Texas and in this Judicial District. Although Defendants are operating under multiple false identities, it appears that Defendants are all non-residents of Texas, located in China and using the Internet and international courier services to market, offer to sell, and sell Counterfeit CHI Products to residents of Texas, and elsewhere in the U.S.[66] Defendants have more than sufficient contacts with Texas to establish personal jurisdiction in this forum based on the fact that each Defendant does business solely through one or more fully-interactive Internet web sites (written in English, accepting U.S. dollars and payment by PayPal)

---

[61] Ghuneim Decl. ¶ 21.
[62] *Id.*
[63] *Id.* ¶ 23.
[64] *Id.* ¶ 22.
[65] *Id.* ¶ 24.
[66] *See, generally,* Hewlett Decl.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 15**

with the sole purpose of selling products, including Counterfeit CHI Products, to residents of the United States, including residents of Texas.[67]   In addition, the Court has jurisdiction over Defendants in Texas based on the fact that Defendants have all either shipped Counterfeit CHI Products to Texas or expressed a willingness to do so.[68]

In addition, a defendant is subject to personal jurisdiction of a federal court "to the same extent permitted a state court…where the federal court sits."[69] Texas law provides that personal jurisdiction in the state is determined by the same guidelines established by the Due Process Clause of Fourteenth Amendment.[70]   The Due Process Clause of the Fourteenth Amendment guarantees that no federal court may assume jurisdiction *in personam* of a non-resident defendant unless the defendant has meaningful "contacts, ties, or relations" with the forum state.[71]

Jurisdiction may be general or specific.  Where a defendant has "continuous and systematic general business contacts" with the forum state[72] the court may exercise "general" jurisdiction over any action brought against that defendant.[73] Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum."[74] Contacts that are isolated or sporadic may support specific jurisdiction if a substantial connection with the forum state is created.[75] In *Nuovo Pignone v. Storman Asia M/V*, the Fifth Circuit consolidated the personal jurisdiction inquiry into a convenient three-step analysis: "(1)

---

[67] *See, generally*, Hewlett Decl.

[68] *Id.*

[69] *Mid City Bowling Lanes & Sports Palace, Inc. v. Ivercrest, Inc.*, 35 F. Supp. 2d 507, 509 (E.D. La. 1999), *aff'd*, 208 F.3d 1006 (5th Cir. 2000), *quoting DeMelo v. Toche Marine, Inc.*, 711 F.2d 1260, 1264 (5th Cir. 1983).

[70] *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999) (noting that because Texas's long-arm statute is coextensive with requirements of the 14th Amendment, the personal jurisdiction analysis may be collapsed into a due process inquiry).

[71] *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

[72] *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

[73] *Id.* at 414, 104 S.Ct. at 1868 n. 9.

[74] *Id.* at 414, 104 S.Ct. at 1868 n. 8.

[75] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 16**

whether the defendant . . . purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable."[76] In the case at hand, each Defendant's conduct satisfies all three prongs of this test.

Each Defendant in this matter has purposely directed its activities to the State of Texas by, *inter alia,* (1) doing business by means of one or more fully-interactive Internet web sites aimed at U.S. residents including residents of Texas and (2) offering to sell, selling, and distributing Counterfeit CHI Products to Texas and/or placing Counterfeit CHI Products in the U.S. stream of commerce. Defendants' contacts with Texas are those same activities under which Farouk's causes of action for trademark counterfeiting and cybersquatting arise.

Courts in the Fifth Circuit addressing the issue of whether personal jurisdiction can be constitutionally exercised over a defendant based on Internet presence look to the "nature and quality of commercial activity that an entity conducts over the Internet."[77] In *David Mink v. AAA Development LLC*, the Fifth Circuit adopted the *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* standard for jurisdiction based on Internet presence.[78] The *Zippo* decision categorized Internet use into a spectrum of interactivity and found that personal jurisdiction is proper where a defendant clearly does business over the Internet by entering into contracts with residents of other states which "involve the knowing and repeated transmission of computer files over the Internet."[79]

---

[76] *Nuovo Pignone v. Sorman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002) (citing *Burger King Corp.* 471 U.S. at 474).
[77] *Zippo Mfg. Co. v. Zippo DOT Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997).
[78] *Mink*, 190 F. 3d at 336.
[79] *Zippo*, 952 F. Supp. at 1124.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 17**

In the case at hand, there can be no question that each Defendant is subject to personal jurisdiction based on its operation of a fully-interactive on-line business accessible to and intended for residents of Texas. Farouk has shown each Defendant is in the business of selling Counterfeit CHI Products at wholesale and retail to U.S. residents, including residents of Texas.[80] Each Defendant operates one or more web sites that are in English, offer Counterfeit CHI Products intended for U.S. consumers, accept payments in U.S. dollars via PayPal (a payment provider located in the U.S.) and ship anywhere in U.S., including Texas.[81] In fact, Farouk's investigation has revealed that Defendants do business solely over the Internet.[82] In order to mask their true identities, Defendants operate under false names and addresses so that the Internet is the only way to contact and do business with Defendants.[83] Other Courts, including Courts in the Fifth Circuit, applying the *Zippo* test, have not hesitated to find defendants who sell counterfeit goods on fully-interactive web sites subject to personal jurisdiction in the forum where such sites are accessible.[84]

In addition, each Defendant is subject to jurisdiction based on sales and offers of sale of Counterfeit CHI Products in the Judicial District and/or placing Counterfeit CHI Products into the U.S. stream of commerce. Eleven (11) of the Counterfeit CHI Products purchased in the course of this investigation were delivered to Houston.[85] Each Defendant has expressed willingness to ship to

---

[80] Hewlett Decl. ¶¶ 12-13.
[81] *Id.* ¶¶ 9-18.
[82] *Id.* ¶ 32.
[83] *Id.* ¶¶ 18-31.
[84] *See, e.g., Chanel, Inc. v. Lin et al.*, No. C-09-04996-JCS, 2010 U.S. Dist LEXIS 61296, at *17 (N.D.C.A. May 7, 2010) ("Personal jurisdiction is appropriate where an entity is conducing business over the internet and has offered for sale and sold its products to forum residents"); *Action Tapes, Inc. v. Victoria Weaver*, No. 3:05-CV-1693-H, 2005 U.S. Dist LEXIS 8675 (N.D. Tex. Oct. 24, 2005).
[85] Hewlett Decl. ¶ 16.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 18**

any address in the U.S.[86] Courts in this Circuit have found that a single sale of a trademarked product in violation of the Lanham Act in the forum is sufficient to establish personal jurisdiction.[87]

Moreover, Defendants are all selling Counterfeit CHI Products at wholesale to sellers whom they know will be selling these goods at retail throughout the U.S. Placing a product into the stream of commerce, at least where the defendant knows the product will ultimately reach the forum state, may rise to the level of "purposeful availment."[88] The Fifth Circuit has held that "mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce."[89] The Fifth Circuit follows the rule of *World Wide Volkswagen Corp. v. Woodson* which holds that a state does not offend due process by exercising jurisdiction over an entity that "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."[90]

The final step in Court's jurisdiction analysis is "to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice'."[91] Defendants ultimately will have the burden to demonstrate that the assertion of jurisdiction would be unfair to them.[92] The Fifth Circuit has held that the assertion of jurisdiction will only rarely be found to be unfair once minimum contacts are established.[93] At that time, the Court would consider and balance

---

[86] Hewlett Decl. ¶ 12.
[87] *Sinko v. St. Louis Music Supply Co.*, 603 F. Supp. 649 (W.D. Tex. 1984); *Finck Cigar Co. v. El Duque Group, Inc.*, No. SA-99-CA-0817-EP, 2000 U.S. Dist. LEXIS 22728, at *1 (W.D. Tex. May 12, 2000).
[88] *Luv n' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006).
[89] *Ruston Gas Turbines v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 111, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)); *Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081 (5th Cir. 1984).
[90] 444 U.S. 286, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).
[91] *Burger King Corp*, 471 U.S. at 476.
[92] *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 211 (5th Cir. 1999).
[93] *Id.*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 19**

"(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies."[94]  Although not Farouk's burden, as set forth herein, the balance of all of these factors favor Farouk.  In other counterfeiting cases, courts in this Circuit have held that the State of Texas has a significant interest in this adjudicating such matter, since counterfeit products harm Texas consumers.[95]

### B.  Farouk Is Entitled To a Temporary Restraining Order and Preliminary Injunction Enjoining Defendants' Illegal Acts

Once a violation of the Trademark Act of 1946, 15 U.S.C. § 1051, et seq., as amended (the "Lanham Act") is demonstrated, injunctive relief will readily issue.[96]  This Court and other courts in this Circuit and elsewhere have granted preliminary relief when a party's proprietary rights are threatened by the sale of potentially counterfeit versions of its products, bearing trademarks and ornamentation indicating affiliation with the moving party.[97]

The Fifth Circuit has held that a plaintiff is entitled to the extraordinary relief of a temporary restraining order or preliminary injunction if it establishes the following: (1) a substantial likelihood that plaintiff is likely to prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if interlocutory injunctive relief is not granted; (3) that the threatened injury

---

[94] *Ruston Gas Turbines,* 9 F.3d at 421.

[95] *See Id.* ("Texas, as [a] forum state, also has an interest in adjudicating a dispute that involves a sale of goods to a Texas consumer...."); *see also Phillip Morris USA, Inc. v. Lee,* 494 F. Supp. 2d 544 (E.D. Tex. 2007).

[96] *See, e.g., Boston Prof'l Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1013 (5th Cir.), *cert. denied,* 423 U.S. 868 (1975); *See PGA v Bankers Life & Cas. Co.,* 514 F.2d 665, 670-71 (5th Cir. 1975); *Dallas Cowboys Cheerleaders v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir. 1979); *Waples-Platter Cos. v. Gen. Foods Corp.,* 439 F. Supp. 551, 573-75 (N.D. Tex. 1977).

[97] *See, e.g., Farouk Sys., Inc. v. Zoonda Supply, et al.,* 4:08 CV 1872 (VDG) (S.D. Tex. Jun. 12, 2008); *Animale Group, Inc. v. Sunny's Perfume, Inc.,* 5:07 CV 13 (MA) (S.D. Tex. February 9, 2007); *Farouk Sys., Inc. v. Princess Silk, LLC., et al.,* SACV07-1190 JVS (MLG) (C.D.C.A. October 2007); *The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.,* 10 CV 1630 (AKH) (S.D.N.Y. Mar. 2, 2010).

to plaintiff outweighs any threatened harm an injunction may do to defendants; and (4) that granting a preliminary injunction will not disserve the public interest.[98]  As shown below, Farouk satisfies its burden of proving each of these four elements.

1.    Farouk Is Likely to Prevail on Its Claims

Farouk will likely prevail on its trademark counterfeiting and cybersquatting claims.

**a.    Farouk Is Likely to Prevail on Its Trademark Counterfeiting**

To prevail on its trademark infringement claims, Farouk must prove that, *inter alia*:  (1) Farouk has rights senior to Defendants in the CHI Marks; and (2) there is a likelihood of confusion between the CHI Marks as used by Farouk in the marketplace and the marks used by Defendants.[99]

Through its pleadings and the accompanying declarations, as well the findings of a prior counterfeiting action in this Court, Farouk has provided evidence verifying its ownership of its CHI Marks.[100]  Farouk's trademark registrations are *prima facie* evidence of the validity of its CHI Marks and its exclusive right to use the CHI Marks in commerce on or in connection with the goods Defendants are counterfeiting.[101]  Farouk has used, and is currently using, the CHI Marks in commerce on or in connection with the sale of CHI Products since 2002 and plans to do so in the future.[102]  The CHI Marks are further strengthened by the evidence of extensive advertising, length of time in business, public recognition, and uniqueness.[103]  Conversely, Defendants have absolutely no rights in the CHI Marks in the U.S. or in China.  As set forth above, Defendants are running a

---

[98] *See Blue Bell Bio-Med. v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989); *Guy Carpenter & Co. v. Provanzale*, 334 F.3d 459, 464 (5th Cir. 2003); *see also Southern Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 186 (5th Cir. 1982).

[99] *See Blue Bell Bio-Med.*, 864 F.2d at 1256;  *Southern Monorail Co.*, 666 F.2d at 186; *Pebble Beach Co. v. Tour 18, Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998).

[100] *Farouk Sys. Inc.*, 2008 U.S. Dist. LEXIS, at * 3;  Ghuneim Decl. ¶¶ 6-7.

[101] *See* 15 U.S.C. § 1057(b).

[102] Ghuneim Decl. ¶ 6.

[103] *Id.* ¶¶ 4-11; *see also Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988).

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 21**

shadowy counterfeit ring operating under multiple false identities to sell counterfeit version of genuine CHI Products directly or indirectly to unsuspecting consumers in Texas and elsewhere in the U.S.[104]

In the Fifth Circuit, the fact finder considers eight factors in determining whether an alleged infringement is likely to cause confusion. This Court, along with other courts, has held, however, that it is unnecessary to perform the step-by-step examination of each likelihood of confusion factor in cases involving counterfeit marks because counterfeit marks are inherently confusing.[105] Farouk has shown that Defendants are intentionally offering to sell and selling the Counterfeit CHI Products designed to appear in all respects as genuine CHI Products.[106] In cases where a defendant has been so bold as to sell products bearing exact duplications of a plaintiff's trademark, courts have made clear that the plaintiff will prevail on the merits.[107]

Even if the Court were to look at the factors relevant to an analysis of likelihood of confusion, such an analysis confirms that Farouk is likely to prevail on its counterfeiting and infringement claims. The relevant factors in the Fifth Circuit used to analyze whether there is likelihood of confusion are: (1) the similarity between the two products; (2) the identity of retail outlets and purchasers; (3) the identity of advertising media; (4) the type (i.e.,: strength) of trademark[108]; (5) the defendant's intent; (6) the similarity of design; and (7) actual confusion.[109]

---

[104] *See* Hewlett Decl. generally.

[105] *See Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F. Supp. 2d 995, 1007 n.11 (S.D. Tex. 2000) (In the case of a counterfeit mark, confusion is clear and does not require the traditional analysis of the confusion factors) (citations omitted); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) ("…counterfeits, by their very nature, cause confusion.") (citations omitted).

[106] *See* Ghuneim Decl. and Hewlett Decl. generally.

[107] *See Microsoft Corp.*, 129 F. Supp. 2d at 1007 n. 11; *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985-86 (11th Cir. 1995); *In re Vuitton et Fils S.A.*, 606 F.2d 1, 4 (2d Cir. 1979).

[108] Trademarks are typically grouped into four categories: (1) generic marks, which are common descriptions and not entitled to protection; (2) descriptive marks, which merely describe the product or convey an immediate idea of the product's characteristics; (3) suggestive marks, which imply rather than literally describe the product's

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 22**

Farouk's CHI Marks are federally-registered, fanciful marks, which have achieved fame and notoriety with relevant consumers, and therefore qualify as strong marks.[110] The CHI Marks on the Counterfeit CHI Products are identical to the CHI Marks appearing on genuine CHI Products.[111] The Counterfeit CHI Products are the same type of products sold by Farouk, in this case, hair straightening irons and hair dryers designed to look like genuine CHI Products.[112] The Counterfeit CHI Products are sold by Defendants directly or indirectly to same group of consumers as Farouk.[113] Defendants' counterfeit goods are designed to be identical in their appearance to CHI Products.[114] The Counterfeit CHI Products bear marks identical to the CHI Marks, and have the same overall shape, prints, style, and appearance as authentic CHI Products.[115] Thus, Farouk has established a likelihood of confusion and is more than likely to succeed on its infringement claim.

**b.    Plaintiff Will Likely Prevail on Its Anticybersquatting Consumer Protection Act Claims**

The Anticybersquatting Consumer Protection Act of 1996 (ACPA) is applicable in instances when a domain name registrant has a bad faith intent to profit from a domain name that "is identical or confusingly similar to or dilutive of" the distinctive or famous mark of another.  In such cases, in addition to other damages, "a court may order the forfeiture or cancellation of the domain name or

---

characteristics and require imagination and thought to determine the product's nature; and (4) arbitrary and fanciful marks.  Arbitrary and fanciful marks, like the CHI marks, are inherently distinctive and, like suggestive marks, they are protected without the need for proving secondary meaning.  *See Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 226-27 (5th Cir. 2009).

[109] *See Sno-Wizard Mfg., Inc. v. Eisemann Prod. Co.,* 791 F.2d 423, 428 (5th Cir. 1986).

[110] *See Farouk Sys., Inc. v. Parmar,* 2008 U.S. Dist. LEXIS; *Firma Melodiya v. ZYX Music GmbH,* 882 F. Supp. 1306, 1312 (S.D.N.Y. 1995) (citing *Church of Scientology Int'l v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 41 (2d Cir. 1986).

[111] Ghuneim Decl. ¶ 23, Ex. B, C.

[112] *Id.*

[113] Ghuneim Decl. ¶ 23

[114] *Id.* ¶¶ 22,23, Ex. B, C.

[115] *Id.*

the transfer of the domain name to the owner of the mark."[116]  Courts have often stated that one of

the focuses of the ACPA is to address counterfeit sellers who "register well-known marks to prey

on consumer confusion by misusing the domain name to divert customers from the mark owner's

site to the cybersquatter's own site, and target distinctive marks to defraud consumers."[117]

Defendants are doing just that and have registered and are using at least the following 19 domain

names containing the CHI Marks in order to divert consumers to web sites where they sell

Counterfeit CHI Products:

> chibuyus.com, chifactoryoutlet-us.com, chiflatirona.com, chiflatironb.com, chiflatironc.com,
> chiflatironm.com, chiflatironn.com, chiflatironok.com, chiflatirons.com, chiflatironsa.com,
> chiflatironsv.com, chiflatironv.com, chiflatirony.com, chihaironline.com, chiirontop.com,
> chi-hair.com, ghdchis.com, ghdchisales.com, mk4chi.com.[118]

To prevail on its claim for cybersquatting,  Farouk must show 1) that its CHI Marks are

distinctive and famous,  2) the Infringing Domain Names are identical or confusingly similar to or

dilutive of the CHI Marks, and 3) bad faith intent by Defendants.[119]

### i. The CHI Marks Are Distinctive And Famous

Farouk's well-established CHI Marks are closely linked with Farouk's success and, as set

forth above, Farouk has spent devoted large resources to building the goodwill and notoriety

embodied in the CHI Marks.[120]  As this Court has found in a separate litigation, the CHI Marks

have a high degree of acquired fame and distinctiveness both in Texas and worldwide.[121]  Many of

the U.S. registrations for the CHI Marks are incontestable, further entitling Farouk to a presumption

---

[116] 15 U.S.C. § 1125(d).

[117] *Lucas Nursery v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004); *see also*, *Diarama Trading Co., Inc. v. J. Walter Thompson U.S.A., Inc.*, No. 01 Civ. 2950 (DAB)(DCF), 2005 U.S. Dist. LEXIS 19496, at *38 (S.D.N.Y. Sept. 6, 2005); *Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis*, 04 Civ. 6107 (DAB), 2006 U.S. Dist. LEXIS 56703, at *37 (S.D.N.Y. Aug. 8, 2006).

[118] Hewlett Decl ¶27.

[119] *See* 15 U.S.C. § 1125(d)(1)(A);  *E & J Gallo Winery v. Spider Webs Ltd. et al.*, 286 F.3d 270, 274 (5th Cir. 2002).

[120] Ghuneim Decl. generally.

[121] *Farouk Sys. Inc.*, 2008 U.S. Dist. LEXIS 62920, * 3.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 24**

of inherent distinctiveness. Thus, Farouk is likely to succeed in showing that its CHI Marks are distinctive or famous.

### ii. The Infringing Domain Names Are Identical to the CHI Marks

The Infringing Domain Names are identical or confusingly similar to the CHI Marks. The inclusion of a plaintiff's trademark combined with usage of the mark on the web site in question has been held to be sufficient for a finding of confusing similarity for ACPA purposes.[122] Courts have found that the addition of generic or geographic terms, such as 'buy,' 'sales,' 'store,' or 'online,' are not sufficient to distinguish the domain name from a protected mark that it contains.[123] The fact that the most distinctive aspect of the CHI Marks (*i.e.*, the word 'CHI') appears without alteration in all these domain names, clearly referring to the CHI Products, is sufficient to show that these Infringing Domain Names are identical and or confusingly similar to the CHI Marks.

### iii. Defendants Have Bad Faith Intent to Profit from the CHI Marks

Courts have held that the registration of a trademark owner's mark as part of a domain name used to sell counterfeit versions of the trademark owner's goods is a particularly egregious form of bad faith.[124] Bad faith could hardly be more clear than in a case like this, where Defendants are using the CHI Marks in domain names used for web sites that sell Counterfeit CHI Products. Accordingly, the Court should not hesitate to find Farouk likely to succeed under its ACPA claims.

2. Defendants' Sale of Counterfeit CHI Products Irreparably Harms Plaintiff's Marks, Goodwill And Business

The damage to a trademark owner through diminished goodwill, such as loss of control over reputation or loss of quality control of its products, is irreparable and such irreparable injury is

---

[122] *Mattel, Inc. v. Internet Dimensions, Inc.*, 55 U.S.P.Q.2d 1620 (S.D.N.Y. 2000).
[123] *See, e.g. Prime Publishers, Inc .v. Am.-Republican, Inc.*, 160 F. Supp. 2d 266, 279-280 (D. Conn. 2001); *Freedom Calls Found. v. Bukstel*, No. 05 CV 5460 (SJ)(VVP), 2006 U.S. Dist. LEXIS 19685 (E.D.N.Y. Mar. 3, 2006).
[124] *See, e.g. Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 584-585 (D. Pa. 2002).

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 25**

generally presumed sufficient for the grant of a injunctive relief.[125] This Court and others have

stated that establishing a high probability of confusion as to source or sponsorship almost inevitably

establishes irreparable harm.[126]  In addition, the flooding of the United States market with

Defendants' Counterfeit CHI Products, identical in appearance to Plaintiff's goods, yet of lower

quality, plainly causes irreparable injury.[127]  As a result of Defendants' counterfeiting, potential

consumers will believe lower-quality Counterfeit CHI Products are made by and sold with Farouk's

authorization, causing irreparable harm to Farouk.[128]  Farouk has established that Defendants'

distribution and sale of Counterfeit CHI Products cause Farouk irreparable harm through loss of

goodwill in the CHI Mark and lost sales of genuine CHI Products.[129]

      3.     <u>There is a Fair Ground for Litigation and the<br>Balance of Hardships Tips Decidedly in Plaintiff's Favor</u>

      Farouk strongly believes it has established beyond question the required likelihood of

success as to Defendants' liability for trademark infringement and counterfeiting.  Once likelihood

of success on the merits it shown, this Court must then balance Farouk's harm from the wrongful

denial of a preliminary injunction against any harm Defendants may suffer from granting an

injunction that would not be cured by prevailing on the merits and recovering on Farouk's

---

[125] *See Pro Hardware v Home Ctrs. of Am., Inc.*, 607 F. Supp. 146, 154  (N.D. Tex. 1984);  *Waples-Platter*, 439 F. Supp. at 573-75; *Controls Int'l, Inc. v. Kinetrol, Ltd.*, No. 3:97-CV-2504-D, 1998 U.S. Dist. LEXIS 4794 (N.D. Tex. Mar. 25, 1998); *Paco Rabanne Parfums S.A. v. Norco Enters.*, 680 F.2d 891, 894 (2d Cir. 1982) ("likelihood of damage to reputation and good will . . . entitles a plaintiff to preliminary relief").

[126] *See Chemlawn Serv. Corp. v. GNC Pumps, Inc.*, 690 F. Supp. 1560, 1569 (S.D. Tex. 1988) (*citing Home Savings of Am. v. Home Savings Ass'n*, 291 U.S.P.Q. 157, 159 (S.D. Tex. 1982)) ("Likelihood of confusion due to the subsequent use of the confusingly similar mark by its very nature causes irreparable harm."); *see also Hawkins Pro-Cuts, Inc. v. DJT Hair, Inc.*, No. 3-96-CV-1728-R, 1997 U.S. Dist. LEXIS 22418 (N.D. Tex. July 25, 1997).

[127] Ghuneim Decl. ¶ 24.

[128] Ghuneim Decl. ¶ 23.

[129] *Id.*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 26**

injunction bond.[130]  As set forth herein, the harm to Farouk is irreparable.  Defendants' continued unauthorized use of the CHI Marks on Counterfeit CHI Products threatens Farouk's reputation because it wrests from Farouk the ability to control the quality of CHI Products bearing CHI Marks and threatens to harm Farouk's reputation and destroy the value of the CHI Marks as indicators of source.  In addition, sales of Counterfeit CHI Products deprive Farouk of sale of its genuine CHI Products.

The harm to Defendants, on the other hand, is purely monetary.  Defendants have no legitimate interest in selling their Counterfeit CHI Products or otherwise using the CHI Marks without Farouk's permission.  Moreover, given "the probable outcome of this action, this is [Farouk's] loss which [Defendants] may justifiably be called upon to bear."[131]

Balancing Defendants' potential monetary harm against the irreparable harm to Farouk's goodwill and reputation, built through years of promoting and selling high quality CHI Products, and the disastrous long-term effects of Defendants' unfettered infringement and counterfeiting on Farouk's business, establishes that the harm to Farouk outweighs the harm to Defendants.[132]

4.    An Injunction Against Defendants Is in the Public Interest

In a trademark infringement case, the interest of a third party, the consuming public, is present and paramount.[133]  By enacting the Lanham Act, Congress decided that it is in the public's interest to hold persons liable for using deceptive and misleading trademarks, which protects both

---

[130] *See, e.g., MGM Well Servs., Inc. v. Mega Lift Sys., LLC*, No. H-05-1634, U.S. Dist. LEXIS 34024 (S.D. Tex. July 19, 2005).

[131] *Corning Glass Works v. Jeanette Glass Co.*, 308 F. Supp. 1321, 1328 (S.D.N.Y. 1970), *aff'd*, 432 F.2d 784 (2d Cir. 1970).

[132] *See, e.g., See Pro Hardware*, 607 F. Supp. at 154-55; *see also Am. Rice, Inc. v. Arkansas Rice Growers Coop. Ass'n*, 532 F. Supp. 1376, 1389 (S.D. Tex. 1982); *Lesportsac, Inc. v. KMart Corp.*, 754 F.2d 71, 79 (2d Cir. 1985) ("the potential damage to Lesportsac's mark and goodwill in the absence of a preliminary injunction outweighs the short-term economic harm that KMart may suffer"), *abrogated on other grounds by Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).

[133] *See Am. Rice*, 532 F. Supp. at 1389.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 27**

consumers and trademark owners.[134] Unless Defendants are enjoined, consumers are likely to purchase Defendants' lower-quality Counterfeit CHI Products mistakenly believing that they are genuine CHI Products and the product of Farouk -- at great cost to the consuming public and Farouk alike.[135]

The Lanham Act also promotes a public policy which favors encouraging and protecting innovation.[136] Farouk has invested substantial time, effort, and expense in developing, promoting, and protecting the CHI Marks and CHI Products.[137] To allow Defendants to continue their unfettered counterfeiting of Farouk's intellectual property would defeat the very purpose of the laws against infringement and unfair competition.[138] Thus, granting the requested injunctive relief would benefit the public interest.

## C.   This Court Has the Authority to Issue an *Ex Parte* Order

Farouk is currently unaware of the true identities and locations of the Defendants or the location of Defendants' web sites, or the location of the Counterfeit CHI Products that are being readied for distribution. It is vital that Farouk immediately obtain information concerning Defendants' sources, distribution network, and flow of profits to minimize future irreparable harm. Farouk requests this relief *ex parte* because experience in other cases has shown that, if given notice, Defendants will simply cancel accounts, dispose of or hide their business records related to the counterfeit products, and move their counterfeit operations to another web site or false identity,

---

[134] *See, e.g., SunAmerica Corp. v. Sun Life Assurance Co. of Canada*, 77 F.3d 1325, 1334-1335 (11th Cir. 1996).
[135] *See* Ghuneim Decl. ¶ 23.
[136] *Rubbermaid Commercial Prods., Inc. v. Contico Int'l, Inc.*, 836 F. Supp. 1247, 1262-63 (W.D. Va. 1993).
[137] Ghuneim Decl. generally.
[138] *Rubbermaid*, 836 F. Supp. at 1263.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 28**

which would render meaningless Farouk's equitable right to an accounting of profits from Defendants' sale of the Counterfeit CHI Products.[139]

The need for *ex parte* relief is great, given today's global economy where counterfeiters have all the advantages of anonymity provided by the Internet. Experience in other cases has shown that, without the requested relief, neither this Court nor Farouk will be able to prevent the disappearance or destruction of crucial evidence that would enable Farouk to track the sources of these Counterfeit CHI Products.[140] This Court's authority to issue the *ex parte* Restraining and Seizure Order requested is specifically mandated by § 34 of the Lanham Act.[141] Congress's purpose in providing for *ex parte* remedies was to ensure that courts were able to effectively exercise their jurisdiction in counterfeiting cases and to prevent counterfeiters served with a civil summons from disappearing or quickly disposing of existing inventory of counterfeit items and the records relating to their manufacture and distribution.[142]

Once a violation of the Lanham Act is demonstrated, the issuance of an *ex parte* Order is appropriate upon a showing that: (i) the applicant trademark owner obtaining the order will provide adequate security; (ii) an order other than an *ex parte* Order is not adequate to achieve the purposes of 15 U.S.C. § 1114; (iii) the applicant has not publicized the requested seizure; (iv) the applicant trademark owner is likely to succeed in showing the defendants are using counterfeit marks; (v) an immediate and irreparable injury will occur if such seizure is not ordered; (vi) the materials to be seized will be located at the place identified in the application; (vii) the harm to the applicant in denying the application outweighs the harm to the legitimate interests of the persons against whom

---

[139] Hewlett Decl. ¶ 30.
[140] *Id.*
[141] 15 U.S.C. § 1116.
[142] Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984).

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 29**

seizure would be ordered; and (viii) if the applicant were to proceed on notice to the defendants, the defendants or persons acting in concert with defendant would destroy, move, hide, or otherwise make such materials inaccessible to the Court.[143]

A Preliminary Injunction alone is insufficient in cases, such as the instant one, involving a ring of offshore counterfeiters who have hidden their true identities. Without the remedy of an *ex parte* Temporary Restraining Order and Seizure Order, this lawsuit will be an exercise in futility. Courts, including this Court, comprehending the unfortunate reality of this situation, the covert nature of counterfeiting activities, and the vital need to establish an economic disincentive for trademark counterfeiting, now regularly issue *ex parte* Orders such as the one requested.[144]

Farouk meets each of the criteria for issuance of a Temporary Restraining Order and Seizure Order required by the Lanham Act.[145] Farouk has not publicized the requested seizure.[146] Farouk has submitted evidence to show Defendants' extensive offer for sale and sale of Counterfeit CHI Products.[147] Farouk has established that Defendants have gone to great lengths to conceal their true identities by using multiple false names and addresses to avoid detection for their illegal activities. Because Defendants do business only over the Internet and only under false identities, if given

---

[143] 15 U.S.C. § 1116(d)(4)(B).

[144] *See, e.g., Farouk Sys., Inc. v. Zoonda Supply, et al.,* 4:08 CV 1872 (VDG) (S.D. Tex. Jun. 12, 2008); *Animale Group, Inc. v. Sunny's Perfume, Inc.,* 5:07 CV 13 (MA) (S.D. Tex. February 9, 2007); *Farouk Sys., Inc. v. Princess Silk, LLC., et al.,* SACV07-1190 JVS (MLGx) (C.D.C.A. October 2007); *The North Face Apparel Corp. and PRL USA Holdings, Inc. v. Fujian Sharing, et al.,* 10 CV 1630 (AKH) (S.D.N.Y. Mar. 2, 2010); *Antik Denim LLC v. Da Urban Hut et al.,* 05 CV 10077 (JFK) (S.D.N.Y. Dec. 12, 2005); *The North Face Apparel Corp. v. TC Fashions, Inc.,* 05 CV 9082 (S.D.N.Y. Oct. 25, 2005); *The North Face Apparel Corp. v. Reliance Dep't Store, Inc.,* 03 CV 9596 (BSJ) (S.D.N.Y. Dec. 3, 2003); *Cartier Int'l B.V. v. Sam Liu,* 02 CV 7926, 2003 WL 1900852 (S.D.N.Y. Apr. 17, 2003); *Fila U.S.A., Inc. v. Top Luxor Trading,* 98 CV 5187 (C.D.C.A. June 29, 1998); *Reebok Int'l Ltd. v. McLaughlin,* 89 CV 1739-T (S.D.C.A. Nov. 27, 1989); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.,* 737 F. Supp. 1521 (S.D.C.A.. 1990); *Fila USA, Inc. v. Eidai Int'l,* 93-00837 (D. Haw. Oct. 29, 1995); *Reebok Int'l Ltd. v. Fairgulf Int'l Shipping & Trading, U.S.A., Inc.,* 93 CV 391(W.D. Tex. Sept. 28, 1993); *Cartier Int'l v. Gorski,* 301 CV 1948 (PCD) (D. Conn. Oct. 17, 2001).

[145] Plaintiff has indicated the willingness and ability to provide a bond to the Court in conjunction with the *ex parte* relief that it seeks. *See* Plaintiff's [Proposed] Order, filed herewith.

[146] Gelin Decl. ¶ 11.

[147] Hewlett Decl. generally.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 30**

notice, Defendants can easily move or destroy all records of their identities and hide all evidence of their dealings in Counterfeit CHI Products and/or switch to new identities.[148] If this occurs, Farouk will suffer irreparable injury in that it will be denied access to the evidence to establish the identities of the counterfeiters and the accounting of profits to which Farouk is entitled.  In addition, if Defendants are given notice, there is a strong likelihood that they will destroy all evidence that may assist Farouk in determining the source of the Counterfeit CHI Products, and in stopping the continuing manufacture and flow of these Counterfeit Products.[149]

As part of the requested *ex parte* Order, Farouk also respectfully requests an Order of *ex parte* Seizure of the Infringing Domain Names from Defendants.  Specifically, Farouk requests an Order transferring the Infringing Domain Names, whether by the domain name registries, namely VeriSign, Inc. or by registrars for particular Infringing Domain Names, to a registrar of Farouk's selection to hold and disable the Infringing Domain Names until further Order from this Court.

The use of the CHI Marks in the Infringing Domain Names is causing consumers to purchase Counterfeit CHI Products based on the false belief that these Infringing Domain Names belong to and are operated in conjunction with or under the permission of Farouk.  These sales of Counterfeit CHI Products confuse and harm consumers, and inflict irreparable harm upon Plaintiff's business and reputation.[150]  Given Defendants' *modus operandi* of fluidly moving their operations among dozens of phony names, it is crucial that Farouk be able to prevent Defendants from simply

---

[148] Hewlett Decl. ¶¶ 30-32.
[149] *Id.*
[150] Ghuneim Decl. ¶¶ 23-24.

moving their Infringing Domain Names to new false identities. Other courts have granted such injunctive relief to prevent cybersquatters from continuing to operate.[151]

Given the nature of Defendants' counterfeiting operations, an order other than an *ex parte* Temporary Restraining Order and Seizure Order would be inadequate to achieve the purposes of 15 U.S.C. § 1114. The harm to the CHI Marks, as well as the goodwill in denying the application greatly outweighs the harm to Defendants' interests in continuing to sell Counterfeit CHI Products. If Farouk was to proceed on notice to Defendants, Defendants would likely destroy, move, hide, or otherwise make such evidence inaccessible to the Court.[152] It is thus respectfully submitted that an *ex parte* Temporary Restraining and Seizure Order is necessary to protect Farouk's trademark rights and to prevent further harm to Farouk and the consuming public.

**D.      Farouk is Entitled to an Order Preventing the Fraudulent Transfer of Defendants' Assets**

As also part of the requested *ex parte* Temporary Restraining Order and Seizure Order, Farouk requests an order restraining Defendants' assets so that Farouk's right to an equitable accounting of Defendants' profits from sales of the Counterfeit CHI Products is not impaired. Courts in the Fifth Circuit provide for such relief, including in counterfeiting cases such as this one, to ensure the availability of an equitable accounting.[153] Issuing the Order on an *ex parte* basis will ensure Defendants' compliance with the Order. Experience shows that defendants in these types of

---

[151] *See, e.g., Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d 463, 62 U.S.P.Q.2d 1789 (E.D. Mich., 2000); *Trans Union LLC v. Credit Research, Inc,* 142 F. Supp. 2d 1029 (N.D. Ill. 2001); *Ballistic Prods., Inc. v. Precision Reloading, Inc.,* No. 03-2950 AMD/AJB, 2003 U.S. Dist. LEXIS 13148 (D. Minn. July 28, 2003); *Oliva v. Ramirez,* No. 07-1569 (JAG), 2007 U.S. Dist. LEXIS 62011 (D.P.R. Aug. 21, 2007); and *HER, Inc. v. Re/Max First Choice, LLC,* No. 2:06-CV-492, U.S. Dist. LEXIS 94629 (S.D. Ohio Dec. 12, 2007).

[152] Hewlett Decl. ¶ 20.

[153] *Animale Group, Inc. v. Sunny's Perfume, Inc.,* No. 07-40200, 2007 U.S. App. LEXIS 28183 (5th Cir. Dec. 7, 2007); *Fed. Savs. & Loan Ins. Corp. v. Dixon,* 835 F.2d 554, 560-562 (5th Cir. 1987) (district court has inherent power to freeze defendant's assets through issuance of a preliminary injunction when plaintiff is pursuing an equitable remedy); *see also* Gelin Decl. at ¶8, Ex. A.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 32**

cases will otherwise ignore orders restraining assets that are issued with prior notice and claim ignorance of their responsibilities while simultaneously draining their financial accounts before an order is issued, thereby rendering a plaintiff's right to an equitable accounting meaningless.[154] In this case, given the plethora of accounts controlled by Defendants and the ease with which Defendants will be able to hide their assets, it is particularly important that the Court order an *ex parte* freeze of all Defendants' assets from their counterfeiting operations located in the U.S.

Farouk has shown a strong likelihood of succeeding on the merits of its trademark counterfeiting claims, and thus it ultimately will be entitled to an equitable accounting of profits from sales of Defendants' Counterfeit CHI Products.[155] Because the Lanham Act authorizes the award of an accounting of a counterfeiter's profits, the Court has the inherent power to freeze the counterfeiters' assets to assure the availability of that recovery. In this regard, courts of several Circuits have noted that a district court has the inherent authority, pursuant to the Lanham Act, to issue an order restraining a defendant's assets so that a plaintiff's right to an equitable accounting is not later rendered meaningless.[156] In the seminal case of *Reebok v. Marnatech*, the district court granted the plaintiff a limited restraint of the defendants' assets for the purpose of preserving them, thus ensuring the availability of a meaningful accounting after trial.[157] The Ninth Circuit affirmed the District Court's decision stating:

> Because the Lanham Act authorizes the District Court to grant [Plaintiff's] an accounting of [defendants'] profits as a form of final equitable relief, the District Court has the inherent power to freeze

---

[154] Hewlett Dec. ¶ 30.

[155] 15 U.S.C. § 1117.

[156] *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982 (11th Cir. 1995); *Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1521 (S.D.C.A. 1989), *aff'd* 970 F.2d 552 (9th Cir. 1992) *both cited with approval in Animale Group, Inc.*, 2007 U.S. App. LEXIS 28183.

[157] *Reebok Int'l Ltd.*, 737 F. Supp. at 559.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 33**

[defendants'] assets in order to ensure the availability of that final relief.[158]

In the years since *Marnatech*, virtually all the federal courts, including this Court, have granted the temporary restraint of assets in cases similar to this one.[159] District Courts have the authority to grant such asset restraint pursuant to Federal Rules of Civil Procedure Rules 64 and 65, under §§ 34 and 35 of the Lanham Act, and under the Court's inherent equitable power to issue provisional remedies ancillary to their authority to provide final equitable relief.[160]

In determining whether to issue an order restraining a defendant's assets, a plaintiff must show (1) a likelihood of success on the merits; (2) immediate and irreparable harm as a result of defendants' counterfeiting activities; and (3) that defendants might hide their illegal ill-gotten funds if their assets were not frozen.[161] Farouk has shown likelihood of success and irreparable harm from Defendants' counterfeiting operations and also established that Defendant are operating a Internet-only counterfeiting business using multiple false identifies.[162] Given the anonymity of Defendants' operations, there can be no question that given prior notice, these Defendants would simply shift their assets to different accounts under new phony identities. Accordingly, the grant of an injunction restraining the *ex parte* transfer of Defendants' assets is necessary and proper.

**E.      Farouk is Entitled to Expedited Discovery**

As an additional part of the requested *ex parte* Temporary Restraining Order and Seizure Order, Farouk requests an Order for expedited discovery. District Courts have broad power to

---

[158] *Id.* at 559; *see also Republic of Philippines v. Marcos*, 862 F.2d 1355, 1364 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989).
[159] *See* note 144, *supra.*
[160] *Levi Strauss & Co.*, 51 F.3d at 986-987; *Reebok Int'l Ltd.*, 970 F.2d at 558-61.
[161] *Reebok v. Marnatech*, 737 F. Supp. at 1524, 1527.
[162] Hewlett Decl. and Ghuneim Decl., generally.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 34**

require early document production and to permit expedited discovery.[163]   Expedited discovery may be granted when the party seeking it demonstrates: (1) irreparable injury; (2) some likelihood of success on the merits; (3) some connection between expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury which will result without expedited discovery looms greater than the injury that defendant will suffer if expedited discovery is granted.[164]   Virtually all the federal courts, including this Court, have granted an order for limited expedited discovery as part of the *ex parte* relief in counterfeiting cases similar to this one.[165]

Farouk has shown likelihood of success and irreparable harm from Defendants' counterfeiting operations.  While Farouk has learned some aspects of Defendants' counterfeiting activities, it does not yet know the following with any certainty:  (1) the true identities of Defendants, (2) the scope of Defendants' activities, (3) the sources or locations of the Counterfeit CHI Products, or (4) where the proceeds from Defendants' counterfeiting activities have gone. Farouk, therefore, needs to ascertain this information without delay.  Only armed with this information can Farouk seek to amend the Complaint and Temporary Restraining Order and/or Preliminary Injunction to include other individuals and entities involved in this counterfeiting operation and begin to stem the irreparable harm Farouk has and is suffering from Defendants sale of the Counterfeit CHI Products.

As set forth above, Defendants have gone to great lengths to conceal their true identities and move outside of this Court's reach by, among other things, selling Counterfeit CHI Products under false identities, using phony return addresses on packages of Counterfeit CHI Products they send to

---

[163] *See* Fed. R. Civ. P. 30(b), 34(b).

[164] *See, e.g., Adv. Portfolio Techs., Inc. v. Adv. Portfolio Techs. Ltd.*, No. 94 Civ. 5620 (JFK), 1994 U.S. Dist. LEXIS 18457 (S.D.N.Y. Dec. 28, 1994).

[165] *See* note 144, *supra.*

the U.S. and using false and incomplete information in their registrations for the Infringing Domain Names.[166] Similarly, Defendants are concealing their identities and profits from the sale of Counterfeit CHI Products, by setting up multiple financial accounts with providers such as PayPal that appear from the outside to be separate and unrelated.[167] The use of third-party processors such as PayPal allows Defendants to increase their anonymity, interposing a third-party between the consumer and themselves.[168]

The discovery requested on an expedited basis in Plaintiff's Proposed Temporary Restraining Order has been precisely defined and carefully limited to include only what is essential to prevent further irreparable harm. Discovery of these financial accounts in addition to Defendants' identities and information related to Defendants' B2B web pages and Web Sites and other operations will permit Farouk to gain a full and accurate picture of Defendants' counterfeiting activities and ensure that these activities will be contained.

Farouk is unaware of any reason that Defendants or third parties cannot comply with these expedited discovery requests without undue burden. More importantly, Defendants have engaged in so many deceptive practices in hiding their identities and accounts that Plaintiff's Seizure Order and Asset Restraint may have little meaningful effect without the requested relief. Accordingly, the request for expedited discovery should be granted.

## F. Service of Process By Email is Warranted in this Case

Finally, as part of the requested *ex parte* Temporary Restraining Order and Seizure Order, Farouk requests the Court's permission to serve each Defendant by electronic mail. Defendants are

---

[166] Hewlett Decl. generally.
[167] *Id.* ¶ 24.
[168] *Id.*

intentionally doing business solely over the Internet[169] and operating under multiple false names and addresses[170] in order to avoid detection, to prevent service and to operate outside the reach of the United States courts, while conducting a hugely profitable counterfeiting business with consumers in the U.S., including this Judicial District. Given that Defendants are willfully concealing their true identities, it would be virtually impossible to serve Defendants with process without permission to serve by electronic mail.[171]

The goal of Fed. R. Civ. P. 4 is to provide more flexibility in the procedures for giving defendants actual notice of commencement of an action and to eliminate unnecessary technicalities in the service of process.[172] Due process requires that any service of notice be "reasonably calculated, under all circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections."[173] This Court has previously allowed service of process by email as appropriate under Fed. R. Civ. P. 4 and Texas Rule of Civil Procedure 106(b), including in circumstances highly similar to this one where defendants conducted business through the Internet, used false addresses so that plaintiff did not know defendants' actual address, and conducted their illicit business with customers via the Internet.[174] In the *Keller Williams* case, this Court allowed service of process by email to eight email addresses that the defendants had used. The Court found such service by email met the *Mullane* due process

---

[169] Hewlett Decl. ¶¶ 13, 32.
[170] *Id.* ¶¶ 18-24, Ex. B.
[171] Gelin Decl. ¶ 9; Hewlett Decl. ¶ 32.
[172] 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1061, at 216 (2d ed. 1987).
[173] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).
[174] *Keller William Realty, Inc. v. Charles Lapeer*, et al., No. 4:08-CV-1292, 2008 U.S. Dist. LEXIS 58079 (S.D. Tex. Oct. 20, 2008), *citing Rio Props., Inc. v. Rio Int'l Interlink*, 284 F. 3d 1007, 1016 (9th Cir. 2002) (allowing service by email as proper service under Fed. R. Civ. P. 4(f)(3)).

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 37**

requirements of being "reasonably calculated, under all circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections."[175]

Like the defendants in the *Keller Williams* case, Farouk has shown through its investigation that Defendants are using multiple fake names and addresses for each of the different facets of their business.[176] Farouk's investigators have attempted to find Defendants' identities, addresses, and physical contact information in the U.S. and China through a variety of investigative means, and have concluded that Defendants are using false and incomplete information in connection with all facets of their business including their web pages, web sites, domain name registrations, and return addresses on packages of Counterfeit CHI Products.[177]

Farouk's investigators have communicated with and/or received emails from Defendants at fifty (50) different email addresses.[178] Farouk has every reason to believe that these email addresses are correct and that they are regularly monitored.[179] Farouk's investigators have additionally uncovered fifty-three (53) PayPal accounts used by Defendants to receive payments.[180] Each of these PayPal accounts is linked to a unique email address, some of which overlap with email addresses Defendants have used for communication.[181] Farouk proposes sending service via email to all email addresses through which its investigators have been in contact with Defendants, as well as to each of the email addresses associated with Defendants' PayPal accounts. Defendants will therefore have actual notice many times over of the Summons and Complaint, as well as this Court's Orders and supporting documents. In an abundance of caution, Farouk proposes using an

---

[175] *Id.* at *5, *citing Mullane*, 339 U.S. at 314.
[176] Hewlett Decl. ¶¶ 18-24, Ex. B.
[177] *Id.* ¶ 29.
[178] *Id.* ¶ 33.
[179] *Id.*
[180] *Id.* ¶ 34.
[181] *Id.*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 38**

online service, RPost (www.rpost.com), which provides valid proof of authorship, content (e-mail body and attachments), delivery, and official time sent and received.[182] Thus, Farouk will be able to provide confirmation of delivery when Defendants receive email service.

Service by email thus serves the interests of justice, not to mention the principles of fairness. Accordingly, the Court should grant Farouk leave to serve Defendants with the Summons and Complaint, along with the other papers filed by this action via Defendants' one hundred three (103) established email addresses.

## IV.
## CONCLUSION

The size and scope of Defendants' counterfeiting operations are irreparably harming Farouk's business and its CHI brand. Without entry of the requested relief, Defendants' sale of the Counterfeit CHI Products will continue to lead consumers and others to believe Defendants' Counterfeit CHI Products are genuine CHI Products that have been authorized by Farouk, when in fact, they have not. Defendants are banking on the fact that brand owners like Farouk will, at most, challenge one or two of the vast number of B2B web pages and Defendants' Web Sites under their control, allowing them to switch sites and names and continue with business as usual. The only chance Farouk has to curtail Defendants' counterfeiting ring is by a comprehensive injunction allowing for restraint of all these B2B web pages, web sites, and their domain names, expedited discovery, and the restraint of any assets of Defendants that Farouk is able to locate.

Based upon the foregoing, Farouk respectfully requests that this Court grant a Temporary Restraining Order restraining Defendants from selling Counterfeit CHI Products, an Order of

---

[182] Gelin Decl. ¶ 10.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR INJUNCTIVE RELIEF - PAGE 39**

Domain Name Transfer, an Asset Restraining Order, an Order for Expedited Discovery, and an Order to Show Cause for Preliminary Injunction.

Respectfully submitted,

GREENBERG TRAURIG LLP

Dated:  July 26, 2010

By: /Anthony F. Matheny/
      Anthony Matheny
      Attorney-In-Charge
      Texas State Bar No. 24002543
      S.D. Texas Admission No. 303157
      1000 Louisiana, Suite 1700
      Houston, Texas   77002
      (713) 374-3583 (Telephone)
      (713) 754-7583 (Fax)

Of Counsel:

Ben D. Tobor
Texas State Bar No. 20050900
S.D. Texas Admission No. 5254
GREENBERG TRAURIG, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  713-374-3568
Facsimile:  713-754-7568

Scott Gelin
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue, 34th Floor
New York, NY  10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
*Pro hac vice pending*

*Attorneys for Farouk Systems, Inc.*